Ladies and gentlemen, I'm Judge Dennis and I'm here with Judge Elrod and Judge Costa to hear your argument today. We have extra time that has been given to the mucus, I believe. So there will be 25 minutes on each side. You have to give that 5 minutes more than the others have. So I'm going to start with Mr. Singer. I believe he's first. Thank you, your honor, and may it please the court. This case is about blatant discrimination by statute in favor of Texas incumbents who are existing transmission owners into building, owning, and operating of new transmission lines that are interstate transmission lines. This is similar to Texas passing a law saying that you have to be a resident for a couple of years in order to operate a liquor store and get a license. And that happens to be exactly what the United States Supreme Court struck down as a violation of the Commerce Clause just last term, even though there is express authority in the 21st Amendment given to the states to regulate alcoholic beverages. Now I note here, by contrast, we are dealing with interstate transmission lines. Not local distribution lines that are low voltage and run throughout our communities and homes, but the high voltage transmission lines that are part of an interstate grid. Lines that are planned and put out for bidding by multi-state independent system operators set up under federal authority and which states like Texas have joined. Mr. Stringer, based on what you just said, Texas has this unique system, I think we've all read up on it. In this case, it does not involve ERCOT, but with respect to ERCOT, can Texas basically do what it wants free of any Commerce Clause concerns? Certainly, we think that it's a much different case as to whether the Commerce Clause would apply within ERCOT, and that's not this case. And we note that there's a separate rule in ERCOT, a nodal rules protocol, that says that within ERCOT, the lines go to the existing transmission owner. So the invalidating of SB 1938 would not change anything with respect to ERCOT. That brings me to whether or not you're making a facial challenge. Because under Salerno, you would have to show that there could be no constitutional application. And if you are conceding that where ERCOT is, that it could be, then that seems to be a problem if you're truly making a facial challenge rather than an as-applied challenge. In our complaint, Your Honor, we've indicated we're making both a facial and an as-applied challenge. Does your facial challenge fail? I don't think it fails because it would not have effect within ERCOT to hold this unconstitutional because of the separate nodal protocol. So the only reason this was passed and the only effect of the law is within those regions of Texas, which are part of MISO, SPP, and other independent system operators. Counsel, this statute covers more than just this element. And as the LCRA points out in its amicus brief, you're seeking to strike down the entire statute, it appears, whereas a number of the aspects of the statute do not apply at all to this circumstance. And, in fact, would have some of these safety issues and things for ERCOT and others. We would have no problem with a determination by this court that reverses and cards out ERCOT. We're not seeking to change the status quo within ERCOT. This law was passed because of what was happening with respect to Rule 1000 by FERC, which opened up competitive bidding by the independent system operators. It was passed specifically, we think, in reaction to our being successful in the Hartburg-Sabine bidding. And we're not seeking to change anything within ERCOT or to change the status quo before Section 1938 was passed, which brings us to... Mr. Senator, if I can ask you, I know there's the whole Tracy issue, which you want to address. But if you put Tracy to the side for a second, it seems to me the real tension in this case is in deciding what is an in-state interest and what's an out-of-state interest. And the state says this is a mere incumbency preference. And incumbency preferences, or even outright requirements that you have to be an incumbent to do business going forward, that those don't implicate the dormant commerce clause. So what is your best case law saying that incumbency requirements are discriminatory under the commerce clause? And in answering that, if you can address the Fourth Circuit case law in colon that they rely on. Yes, Your Honor. I think our best case, and the one that controls here, is Carbone. Because there you had an incumbent waste company. And, in fact, the Supreme Court said in response to the argument that is similar to the Texas argument here, that they're just one incumbent. That the fact that the state there was favoring a sole incumbent made the situation of protectionism even worse. And with respect to Colon, that was a case by the Fourth Circuit which did not prevent out-of-state companies from qualifying for a certificate of need. It simply had them go through that process. Just like we are prepared to go through the process before the Public Utilities Commission, before Texas came along and said, You can't get a certificate of convenience and necessity no matter what. So we think that it's a different situation with respect to discrimination. And Carbone... Did they just give preferences to incumbents? If the rule here just said, one factor in deciding who to grant these licenses to is whether there's a demonstrated history of constructing transmission lines in Texas, maintaining those lines. I think they would have to be open to allowing that demonstrated record to be shown by companies other than the incumbent. For example, that NextEra could point to Lone Star Transmission, which is a NextEra company. Which Texas allowed in, into the Iroquois area in fact. And which has an excellent record. And to look at NextEra's record of performance throughout the United States. I don't think it would be appropriate to draft an ordinance or statute which said only the incumbent's record of performance can be considered. Because that's weighting the scales against competition from out-of-state. And Carbone is the case that controls because they're dealt with services. The service of constructing and providing waste services. And the court made clear that that was unconstitutional. And the response that has been given is, well, these United Haulers. But United Haulers is a case where the government was a participant in a market. Not where you're dealing with private parties like Entergy here and others affected by this law. And in fact, several terms after United Haulers, the Supreme Court in the Davis case said that if we were dealing with a private enterprise in United Haulers, we would not have hesitated to strike it down under Carbone. Now we think it is Carbone rather than Tracy that applies. To begin with, Tracy recognized that they were not creating some public utility exception to the Commerce Clause. They recognized that cases going back as far as Wyoming against Oklahoma had upheld Commerce Clause challenges to public utilities. Why doesn't Texas have an interest in these vertically integrated utilities that have all these requirements? Because they don't just do transmission, they do distribution. Why doesn't Texas have an interest in basically protecting those companies that fulfill these state needs of supplying electricity to everyone, even rural people where it's not cost effective? Well, Texas can do so in a non-discriminatory way as it did before this law was passed. In fact, this is their usual case where I'm able to quote the Texas Attorney General himself who went before the state appellate courts a year ago and made the point that under Texas law before SB 1938 was passed, the traditional utilities, while retaining their right to serve retail customers, did not have, and I'm quoting, an exclusive right to construct and operate wholesale transmission facilities within their certificated retail areas. And that, in fact, the Public Utility Act authorized the commission to grant or transfer these certificates of need to electric utilities who would provide only transmission services. And with respect to those services, NextEra needs to receive a certificate. That certificate would be evaluated by the Public Utility Commission. We would have to meet all the requirements of a utility that applies to transmission companies. For example, there's parts of the utility code that say we have obligations to furnish services that are safe, adequate, efficient, and reasonable to construct the facilities in accordance with the code and the like. And I would note that as a practical matter, other companies whose transmission lines are built cross the transmission lines of the retail service provider in that area. So it's not like if one goes out there now, the only lines are those of the retail service provider. And that was a point which was made by the Attorney General of Texas in the application to the Texas courts as well. And even after SB 1938, you have Texas companies like the East Texas Cooperative, which is not a vertically integrated utility that can operate lines. And I would suggest that it's relevant that Lone Star is operating the CREZ lines. And it is not appropriate or we would submit constitutional for Texas to say, well, only when it's important enough for renewable energy, we're going to let out-of-staters come in and build a line like you did with CREZ. But in other circumstances, we're going to discriminate in favor of the Texas entities. So that is why we're here. Can I ask a question about ripeness? Yes. If your facial challenge fails because of Salerno, because it can't be shown that it's unconstitutional in all of its applications as you appear to concede it or elect in it, then is your as-applied challenge rightful of you given that NCSERA has not sought and obtained required authorization and approval from governmental authorities or been denied those? Have you done what you need to do to make this, not you personally, has your client done what it needs to do to make this case right? Yes. Two responses, Your Honor. First, I think the court can consider a facial challenge that applies within two areas of Texas, or three, that cards out a particular area. The law really only changes things within those areas subject to the interstate system operators. But second, an as-applied challenge would be right because the law on its face is a law which says we cannot get or qualify for a certificate of convenience or necessity. So there's nothing to be done under the law at the administrative level. The only thing that is needed is to judge the constitutionality of that, which is this court and the district court rule. Does that mean you can skip the administrative process and come directly to us? What authority do you have for that? Well, I think, interestingly, a case which the other side said they wanted to rely on, the Pacific Gas and Electric case from the Supreme Court in 1983, dealt with a ripeness challenge. And it's in one of the footnotes there. And the challenge to this type of a situation with nuclear plants where it was clear that they could challenge this and they didn't have to go through the administrative process, the court said that that was right. So I think that would be a legal authority for that challenge. Before your time is up, will you address the 8th Circuit case and then also address opposing counsel's argument that traces directly on point? Yes. I'd like to begin by talking about the 8th Circuit case, which we respectfully think is wrongly decided. The 8th Circuit appeared to take the position that out-of-state ownership mattered. And there's no Supreme Court case or case for the circuit that has ever said that one looks to the ultimate parent ownership of the company to determine whether or not there's discrimination. The Texas law also goes beyond the Minnesota law and prevents even any situation where right-of-first refusal is triggered and the company doesn't want to build a line in Texas. They still can only give that authority to build a line to another company that's a Texas-certificated business. And I think that's why everyone's calling this a right-of-first refusal. I mean, in Texas, your client just cannot build transmission lines, right? That is correct, Judge Costa. It is not a right-of-first refusal. It is an absolute ban. And Tracy did not deal with anything like an absolute ban. It dealt with a state preference for the local distribution company in its captive market. And it had a spillover effect in a second market, a competitive market. Here we're dealing with one product in one market, a service market of building, owning, and operating these interstate transmission lines. A particularly interstate market where MISO is the one which is deciding when it needs these lines and it should go out for competitive bidding. And it determined in this case that Nextier offered outstanding combination of value and cost. And some of those costs, by the way, are borne by Louisiana ratepayers, not just Texas ratepayers. So this has got to be way off to one extreme of where the state can't come in and say that only Texas companies can build these facilities. Any more than almost a century ago could a state in the Buck decision say that parts of interstate highway services could be reserved solely for citizens of a particular state. And as noted in the Tracy case, it was expressly reserved that the Commerce Clause applies fully. I believe the United States is using part of my time or that I should reserve the balance of my five minutes for rebuttal. I thought we granted five minutes, too, in addition to your time. Then I would like to reserve the five minutes for rebuttal. You have four minutes and a half left on your first period of time, as I see it. I may continue and still have the five minutes for rebuttal. Okay. Could I please ask... You did get extra time on the front end. Yeah. Counsel. Yes. What do you say to the argument, though, that existing utility owners, most of whom, they are out-of-state. So it's wrong to say that it's favoring Texas. And new out-of-state entrants can participate, and there's a specific mechanism for doing so. Well, taking the second part first, the only way they could, in the argument that's made, is if they buy a utility in Texas. And it's never been the law anywhere that you can avoid a Commerce Clause challenge by saying you can buy one of the in-state actors. If that was the case, you'd have to reverse most of the Commerce Clause jurisprudence that is out there. And similarly, there is no support for looking at whether the company that has the in-state presence, like these utilities, is ultimately owned by an out-of-state company. In the Dean Milk case, no one looked at whether the milk company had ownership out-of-state. Or in Granholm, whether the wineries were owned by out-of-state enterprises. That is not the question. The question is whether or not you're rewarding in-state presence. So this argument, which is not supported by any authority, and which is directly rejected in an 11th Circuit case cited in our papers, we don't think justifies the discrimination clause here. I'd like to... Would you be creating a circuit split with the 8th Circuit, or are there other circuits on that point, on the 8th Circuit? I think you would be creating a circuit split with the 8th Circuit in the sense that the 8th Circuit upheld the Wilfer Law. I think it would be possible to distinguish the 8th Circuit case, but we think fundamentally that case was wrongly decided. Because it did not properly consider that the fact that something is a police power, and it's exercising police power, is just the start of the analysis. You then have to ask whether or not it violates the Commerce Clause. And here we have three separate levels in which the Commerce Clause is being violated. On its face, in its effects, which goes to the fact that the ownership out-of-state doesn't change things, and also purposeful discrimination. And there, that's an intensely factual analysis. We have statements, and these are not stray remarks by non-legislators. This is the official statement of the House sponsor before committee, saying that we are passing this to help the companies with boots on the ground. That's about as clear a statement as one can have. And to say that we're doing this in reaction to FERC's Rule 1000, which opened up these competitions in limited circumstances for competitive bidding. Now, we think it is also heavily factual as to whether or not there can be any justification shown for such discriminatory law. Because that has been established by the Supreme Court to be a rule of virtual per se invalidity. A very heavy burden that the state would then have to carry. Counsel, are we only ruling on the 12B? Or are we also ruling on the injunctive relief question? We are also asking for the denial of injunctive relief to be reversed and remanded. We appreciate very much this Court's expediting of the appeal. And we would respectfully ask that the Court expedite the final part of the appeal, the decision, and to remand with directions that it hold a preliminary injunction hearing forthwith. And we think that if the Court agrees with us that there is facial discrimination, whether that's in the form of a facial challenge or an anti-applied challenge, but facial discrimination here that we have shown, that that is subject into a virtual per se rule of invalidity. And with that rule, I think it would be very difficult for the state. Have you talked about that in your brief? Yes, we have in the last part of our brief in our reply. We've argued that the nature of the remand here should be with clear directions. And it's because the Hartford-Sabine line is one that we could lose any day or any week. Let me ask about the expediting. Your time is up, but let me ask about the expediting. There's some discussion by both sides. If you're right that the Rule 12 shouldn't have been granted, take especially the discriminatory purpose. You just said that's highly fact-bound. And putting aside whether an injunction should issue, there's going to have to be an actual full trial with a full resolution by the District Court, if you're right about all these legal issues. That could take quite a while. There's going to have to be an appeal of that. I don't see, I guess, any way that, under your view, I mean, if we affirm, it's obviously going to be an accident. The whole matter is going to be over. But under your view, how this really ever gets to a quick decision in your favor? So how much of a problem is it really with all these, you know, that you're going to lose the regional grant that you received or approval you received? Well, we think that, first of all, the type of injunction we're seeking is very modest. One that preserves the status quo ante before SB 1938 was passed, at least with respect to the Hartburg-Sabini line. So that would be considered without SB 1938's role. If this Court agrees... I'm trying to hear an answer to the question. You're out of time. Yes. So we think that it can be done on a very quick and expeditious basis because of that and because of the nature of facial discrimination and effects discrimination, which are clear-cut on the statute. Thank you, Your Honors. Adam Chandler, you have five minutes. Thank you, Your Honor, and may it please the Court, I'm Adam Chandler here for the United States. I'd like to begin with just a brief mention of why we're here. And then I'd like to follow up on points from the prior discussion about incumbency, which Judge Costa asked about, and the age of the case, which Judge Allred asked about. So the United States is involved in this case because promoting and preserving competition in interstate commerce is an important part of our mission. That's why we seek to ensure that the Dormant Commerce Clause is applied properly and consistently in challenges like this one. Our position here is a limited one. Our brief identifies three discrete deficiencies in the District Court's analysis, which we think warrant vacating the opinion in order to give the District Court another opportunity to apply the correct Dormant Commerce Clause principles, those that are established by the Supreme Court and reinforced by this Court. I thought your recommendation was a little strange. I mean, I understand sometimes when you're in your position there's maybe disagreement within the government and you're trying to chart a compromised path, but it is a Rule 12. So to the extent there are legal questions, why would we remand, which is going to be followed by an appeal, on what are purely legal questions? That just seems like delay. Well, we think in this case, because the District Court was not applying the correct legal principles to the complaint, we think that the District Court in the first instance should apply the correct legal principles. Now, if this Court disagrees and wants to go ahead and rule on the complaint and the motion to dismiss, we have no position on that. That's certainly within your remit. But we do think that there's sort of a conservative, modest approach that this Court could take to just setting out what the legal standards are and allowing the District Court to apply those to the complaint again. So the federal government doesn't take a position on whether the pipe balancing, how it comes out. Is that correct? You just think it should have been done more robustly. That's absolutely correct, Your Honor. The District Court just gave a cursory statement that basically no burden could possibly overcome the benefits of the law without even specifying what the benefits are. Does the federal government take a position on the questions that I've asked about facial challenges and ripeness and all of that?  Your Honor, on the facial challenge, yes, I do want to draw what may sound like a fine distinction, but we think that the discrimination at issue here is potentially facial discrimination. It may also be discrimination in effect. But that does not amount to just a condemnation of the law at that first step. If you do prove facial discrimination, the state still has a chance to justify that discrimination. It faces a high bar. But the case is not over just because the law itself is facially discriminatory. And to answer your earlier question, we don't have a position on how it applies to ERCOT either. Perhaps that would weigh into the District Court balancing under the discrimination test or potentially Texas could pass a different law that justified the ERCOT in that light. So we don't have a position on that. Do you take a position on any of the other aspects of the statute? The statute has about six elements to it. Do you take any position on any elements of the statute except for this one? No, Your Honor. I think the two parts of the statute that we're focused on are that subsection E and subsection G. The ones about giving the right of first refusal. Maybe that's a misnomer, as we just discussed. And the G portion, which is about designating another entity at the discretion of the incumbent, that also must be something with the presence in the state of Texas. So to address the LSP cases very briefly, we do not think you have to create a circuit split. Now, we had issues with the Minnesota law as well. However, we do think it is easy to distinguish it because the Eighth Circuit's analysis. In two places, actually, if you look at the split opinion on pages 16 and 18, it relied on the fact that non-local interests could build transmission lines if, after 90 days, the incumbent had not taken the right of first refusal or basically had issued a refusal. There were ways for non-local entities to enter there, and the court found that a compelling justification for affirming in that case. That's not present here. And, in fact, this law is much more pernicious in that it, like I said before, gives incumbents the ability to designate a purely local entity with an in-state presence to do the building, if not itself. It's sort of hard to see how that kind of designation is justifiable on a reliability interest or something. And we think that distinguishes the Texas law from the Minnesota one. Although we may disagree with some aspects of the Eighth Circuit's decision, this court need not create a circuit split if it doesn't reach that far. I know your time's up, but if Judge Dennis will allow you, you said you were going to address my incumbency. How incumbents do you relate to, generally, the discrimination under the Commerce Clause? Yes, Judge Castro. I'll just make two very quick points because I know my time's up. The first is that I think incumbency in this case is tantamount to an in-state physical presence. And as Granholm v. Steele says, that can be the basis for unconstitutional discrimination under the Government's Commerce Clause. And on the Colon Health case that Your Honor cited, I want to say that there was a 2013 one and a 2016 one. It actually survived a motion to dismiss in 2013 before failing on summary judgment. And as Mr. Singer pointed out, out-of-state, non-local people could actually apply for a certificate of fair, unlike here. Thank you, Your Honor. Of course. You used your time very well. Thank you. We'll hear from Ms. Lisa Bennett for 20 minutes, and then Mr. Gould for five minutes, and then we'll be back.  May it please the Court. Next year, I was asking this Court to accept that SB 1938 is driven by nothing more than simple economic protectionism. It is not. And this Court should join the Eighth Circuit in holding that a state right of first refusal law favoring incumbents who are here vertically integrated utilities does not violate the Dormant Commerce Clause. I like your side. Everyone seems to want to call this a right of first refusal, and probably because of all the FERC history, I sort of get that. But isn't this just an outright ban? I mean, there is no way for NextEra to build transmission lines in the non-ERCOT part of—well, really ERCOT as well, but we're concerned with the non-ERCOT part of the grid. I mean, it's not just that the incumbents can get first dibs. It's that NextEra is banned completely, right? Other than taking over an existing incumbent utility. Well, I want to push back and defend the term right of first refusal, because really what we're talking about—it helps to define what we mean by an incumbent. And the incumbent that gets the right of first refusal is the one that owns the endpoint that you're connecting to. You own Part A of a transmission line. You get to build Part B. So that's primarily what we're talking about. And when we're talking about transfers, those transfers are not simply allowed to go to any other entity that has done business in Texas before, which is what the implication seems to be and what my opposing counsel is saying. If that were so, then one of NextEra's subsidiaries could get these projects. Instead, what the law does is take—you know, if we can't have the owner of the line that we're going to attach to build it, we'll have the owner of the line next door get to build it. So we're still talking about getting the benefits of having—within a given region, we're having a limited number of companies to facilitate reliability, and that is sort of a second-best option. The state may have a—maybe it has a strong interest in all that, but on this question of the effect on NextEra, I take it your answer is yes, then. They cannot build transmission lines under the law in Texas. That's right, although the exception for purchasing a utility, I mean, I think that that's not what we're relying on in terms of the dormant commerce clause question so much as the practical question. This isn't some remote possibility. The utility in the El Paso area was recently bought by an out-of-state entity. And further, I would note, as I believe Judge Elrod pointed out, that the majority of the entities that have a right of first refusal or, if you don't want to use that term, have the ability to build these additional lines are from out-of-state. I think it's 11 out of 14 in the relevant regions. So it can hardly be said, even under the definition of income and fee— What Supreme Court case says ownership—I mean, I didn't see anything about who owned the wineries in Granholm. I mean, ownership now—also, if you're talking about public companies, ownership is spread everywhere, not just across the country, across the globe with stockholders. But what Supreme Court case says ownership or place of incorporation is what's key for dormant commerce clause? Well, I think the best case that is precedential on this court would actually be this court's decision in the Walmart case. And there they used the language that when you're looking at dormant commerce clause, you look to where the economic interest lies. And there, in fact, they were looking to public corporations versus non-public corporations. So that was very much at issue. And in that case, this court upheld a distinction that was being made by the state between public and non-public corporations on the basis of accountability. And that's a big part of what we're seeing here when we're having legislators talking about having boots on the ground. That quote is talking about having companies that are accountable to the local service areas as it is. That's your interpretation. It's at Rule 12. Especially when it comes to discriminatory purpose, it seems to me it's hard to justify a Rule 12 dismissal when there's at least allegations from which people can draw competing inferences. So the first thing I would say about purpose is that this court also in the Walmart case discussed that it would be a very bizarre result to find a discriminatory purpose or a discriminatory intent on behalf of a legislature that didn't actually lead to a discriminatory effect. It would be a bizarre result. They said in that case, the banned effect on all public corporations, whether they were in-state or out-of-state, provides strong evidence that the legislature did not purposefully discriminate against out-of-state corporations. So they look to effect. And in fact, the effect test is basically the first prong of the Arlington Heights factors, which this court has used in the purpose test. So I think that's the first reason that purpose is appropriate to determine based on the law. And the second is simply that this court, while it is required to accept as true the facts that are pleaded, these are the only facts that there are. And they've presented the legislative history, all the legislative statements. We've got the videos of all the testimony that was heard. What this court is not required to do is accept the plaintiff's gloss on the legal interpretation of those facts. So we have no dispute about what was said, but it simply is not enough. The law was passed right after plaintiffs started getting its approval from the regional entity. Let me ask you this. Would it be discriminatory, not whether it be a sufficient state entity, but would it be discriminatory for Texas to say, we're only going to allow people to drill oil wells in Texas who have already existing oil wells. Going forward, if you want to drill an oil well, you better already have an oil well. That's going to help us because you know what our oil and gas regulations are, and we can be more certain you're going to be able to comply with Texas regulations. So going forward, only incumbent oil well drillers can drill new wells in Texas. Not whether it's justified, but would that be discriminatory against that of state interest? Under the bare hypothetical that you presented, the answer may be yes, but I think it depends on whether there is something like vertical integration in that context. And I think that's really where the business form distinction makes a difference. So I take your honors hypothetical to be two completely interchangeable companies because anybody can put a drill in the ground and extract the oil. Here, what we're comparing, as in Tracy, is bundled service and non-bundled service. I certainly understand why that may make it more justifiable, but I guess just on this threshold question of whether it's discriminatory, I'm not sure how is this different than my oil well example. Again, I understand it may be more justifiable here because of the integration of the endpoints and this, I get that. But why would that one be an example of discriminating and the other wouldn't? Well, because if Tracy tells us this, and also some of the cases dealing with the effects tell us this, but if the companies are not the same kind of companies, there can be no discrimination because you're not comparing apples to apples, you're comparing apples to oranges. And in the case of MISO and SPP, one of the really important points that I'd like to talk about on this is rate jurisdiction. So FERC has jurisdiction to set rates over wholesale prices, wholesale sale prices, whereas Texas has the right to set retail prices. When transmission is bundled with generation and retail as it is in 100% of the public utilities in the MISO and SPP areas, then Texas still gets to set the transmission rates because they're part of a bundled package. So that was one of the purposes also that was laid out in the bill statement, and that really shows a legal distinction about why it's different to have a vertically integrated utility provide the service versus to have a transmission-only company build the service. The statute doesn't say vertically integrated utilities get this preference, and nor in my understanding is that there are these cooperatives, so I don't see it as either facially or in effect a preference that is limited to vertically integrated utilities, even though there I see everything you're saying. Right, so I think vertically integrated utilities put it in particularly stark context, and there is a Supreme Court case, I believe the Arkansas Electric case, talks about co-ops and basically how the co-op is providing the electricity to its member organizations, so it sort of ultimately provides all the levels of electricity production and distribution. But also in ERCOT, the state legislature has recognized that the transmission and distribution piece there, even when the other pieces have been subjected to market forces and competition per the legislature's will, transmission and distribution is still a monopoly and it's still fully regulated. So your Honor is right that it does go beyond vertical integration, but the key point there is the transmission piece is characterized by natural monopoly and is fully regulated, and also that they do have a service area, which means even that they can be required to, for example, build new generation facilities to serve more areas. Next year I just want to carve off the transmission only piece, which I don't think any of this piece is the most lucrative piece of this puzzle. Meanwhile we have these vertically integrated utilities as the starkest example of entities that have a whole set of obligations that maybe become more economically unfeasible as a result of introducing competition just in this one area. And so what Tracy told us to do is when we're comparing to see whether entities are similarly situated for purposes of a discrimination analysis, is we don't look at whether two different types of companies might be able to provide one function in a similar way. We look at the entire entity, and Tracy tells us that directly. So when we look either to ERCOT or to the fully traditional vertically integrated model in the MISO and SPP areas, neither of those is going to be a comparable entity to NextEro. I'll move now to the discrimination piece, and we've talked about some aspects of this already, but there are three main points that I'd like to communicate here today. First, there can be no discrimination on the face of SB1938 when it is concerned on its face with incumbency. The Collin Health case and others have concluded that incumbency is not a proxy for discrimination. You have to look at the facts and determine whether there is discrimination. And the LNP case... Go ahead, Ginger Roe. Opposing counsel has conceded that there are applications of this statute that could be constitutional, perhaps within ERCOT. Doesn't that foreclose a constitutional challenge to the statute on its face under the Salerno Doctrine, which says that it must be unconstitutional in all of its applications? It does. When we're talking about the facial challenge, there's two ways in which I'm referring to facial. Your Honor is absolutely right that a facial challenge of the type that you're discussing is inappropriate because there has to be no scenario in which its application would be constitutional. Here, 90% of the power in Texas is provided by ERCOT. To say that that's simply, you know, oh, we can just take that piece out disregards the rest of the statute. And it's further difficult for me to understand how a declaration that a right of first refusal was unconstitutional could...it's unclear the representation by next era that ERCOT's protocols would continue to have force there. I think that's something that we'd have to explore a lot more. What did you mean when you said facial challenge, then? So when I'm talking about facial, I'm talking about the... Sorry, I missed the end of that. I said, are you using the term loosely or something? So, no, the way I was using it just then is when we talk about discrimination, we look at the face of the statute, in other words, the text of the statute, but they refer to it as the face of the statute. We look at the effect of the statute, and we look at the purpose. You're applying the statute under the Dormant Commerce Clause. You're not trying to tell us that the statute is facially or not facially unconstitutional. Correct. You're just applying a test under the Dormant... Within the analysis. Within the analysis that basically looks at the text on the face of the statute. Your Honor is absolutely right that the facial challenge is inappropriate. And as to your rightness point as well, we had argued a similar point with respect to the injunction because an injunction is seeking extraordinary relief that something needs to be done now in order to let NextEra have their project go forward now. And there's no injunction that could be crafted that would allow that to happen because there are all of these other steps that have to take place that also take time, as Judge Costa has already pointed out. Turning back to the Dormant Commerce Clause... Let me ask the point you were making about incumbency. Take Granholm, the winery case. If the state of New York said only incumbent wineries could sell directly to consumers, would that then have been okay? Would that have been a constitutional muster? Not in that case. And let me make a few distinctions between this case and Granholm and Tennessee wine. So, first, no one disputes that transmission lines themselves have to be built in Texas. Geography inheres in transmission siting in a way that it simply does not in alcohol production. So in Granholm and Tennessee wine, the geographic limitations being imposed were inventions of the legislatures for purposes of protectionism. Second, the state in the utilities context... You know, this is a traditional historic police power. The state always gets to decide whether and where transmission is needed. So private companies can't come in and build transmission absent SB 1938. Whereas if you're talking about shipments of wine, you could just make a shipment of wine or some other product unless the state comes in and tells you you can't. Here, the entire industry of transmission exists because of the state regulation. So it's simply not the same kind of area. And third, as I already noted, we have a state here engaging in a traditional government function of utility regulation with good policy reasons for doing what it did. In Tennessee wine and Granholm, the court could see no justification for those laws and used the term blatant protectionism. This was purely to protect production of a fungible product. Again, why are some of these justifiable? Whether the state interest outweighs the anti-competitive effects? That's a different question than whether it's discriminatory. I mean, first you decide it's discriminatory, then there's these two separate tests. If it's discriminatory on the face of the statute, in effects or with purpose, you have one balancing test. And then if not, it's pipe balancing, which is where the state's usually going to win. Right. I think I would push back on that a little bit, especially in Tracy. The policy reasons do enter into the actual discrimination. I agree on Tracy. Okay. And I would really say that the same thing here. Because, well, if we're talking about the text of the statute, I think it's pretty clear here that the text of the statute is making an incumbency distinction. And the question, at the crux of this case, is whether an incumbency distinction is the same thing as a residency distinction. So in order to determine whether those are the same thing, I think there's no way to avoid looking at the reasons that were given by the state. And that is so, especially in light of the myriad statements that have been made by the Supreme Court and this Court and Tracy and other cases, but in the case of utility regulation, the state has the power to make any number of determinations. Counsel, can you answer the pipe question? It just seems very difficult. This seems to be the hardest part of the case from the perspective of you, I think, that if we can decide on a 12B, that even if we agree completely that there are all these legitimate reliability and consumer concerns, even if we were to know that, it's 12B, and they stated to the contrary. So do you have any authority that would say you can decide spike on 12B for something that would give us some confidence in district court's ruling? Right. Well, I would point first to the Eighth Circuit's ruling in LSP transmission. And that was also on a 12B6 motion, and they did resolve the pipe question. But I think sort of the first level at which you could decide pipe on a legal basis is based on the state's wide latitude to regulate electric utilities. And that latitude is so wide that it's to the point it's not clear pipe balancing should even be applied. And I would point the court to Department of Revenue versus Davis from the Supreme Court and also to Electric Power Supply Association versus Star. Both are cited in our brief. That one is a Seventh Circuit case. And there they directly say pipe does not apply to a state's regulation of electric capacity. Department of Revenue versus Davis also makes a pretty direct statement. They say where a quintessentially government function is involved, the law is likely motivated by legitimate stated objections other than simple economic protectionism. And, in fact, Pike itself also recognized that a statute should be upheld where the propriety of local regulation has long been recognized. So basically utility. Excuse me. Excuse your time. Thank you. Thank you, Your Honor. Mr. Singer, you have five minutes. I believe, Your Honor, Amicus Entergy has five minutes. Well, I'm sorry. You take over on those five minutes. I'm sorry. No problem. Thank you. May it please the court? I'd like to respond to a few statements that were made earlier. First, I'd like to respond to Judge Coffman's question about whether Texas could prohibit anyone but incumbent oil drillers from drilling wells. And the answer is no. That's because that's a free private enterprise. And this case isn't about free competition at all. Tracy says that the purpose of the Dormant Commerce Clause is to protect free private trade in the national marketplace. And you can get into this. I see where Tracy might require a different distinction with my hypo because of the regulation in the electricity industry. But why would that hypothetical then not indicate this is also discriminatory, which is different. Tracy says discrimination is okay if they're not similarly situated. I believe, Your Honor, the answer is also expressed in the United Haulers and the Davis, the Department of Revenue versus Davis cases that came after Tracy. And what that did was they looked at the fundamental difference between what was being provided, whether in the United Haulers case where the court said the only difference between that and carbone was that the government had stepped in and provided the service. It was a fundamentally different activity that the Dormant Commerce Clause didn't prohibit. And I would submit that that is exactly the same here. Counsel for Nexterra says that carbone is their best case, but I would say the same principles that produce a different result in the United Haulers apply. Because here, Texas has decided to use public utilities to provide essential electric delivery services. Those are literally a matter of life and death for Texas citizens. Now, according to the Supreme Court, Mr. Singer said that, well, this isn't the government providing the service, it's private entities. But that's just using a label. The court doesn't use formalism in this area. What the court said in the United Haulers was the difference was that governments protect the health, safety, and welfare of its citizens, and it relied on Scalia's concurrence in Tracy that said nothing in the Dormant Commerce Clause to its prudence suggests that private marketers are the same as public utility companies. That principle was actually distilled in the Department of Revenue case versus Davis that Mr. Singer also referenced. And here I'd like to quote from the court. He said that, in the paradigm of unconstitutional discrimination, the law chills interstate activity by creating a commercial advantage for goods or services marketed by local private actors, not by governments and those that they employ to fulfill their civic objectives. That principle applies its full force here. Texas has chosen to use public utilities to fulfill its traditional police role to look out for the health and safety and welfare of its citizens. Now, while electric utilities may be privately owned, the state's response to this is to impose comprehensive regulation and to displace competition entirely. That's permissible under Tracy and the United Haulers. The provisions of PURE are clear on this point. The statute was enacted to protect the public interest inherent in the rates and services of public utilities. Public utilities' property is dedicated to the public interest. They actually use the state's imminent domain power to take private land in order to put it to public use. Now, the comprehensive regulatory scheme is also another distinguishing factor from Carbone. There, the private hauler didn't have any... didn't enter into a regulatory contact with the local municipality. He was simply given a preferred status to raise revenue so that the city could then buy the facility. None of the cases that McSterra cite actually involve competition between public utilities. The Wyoming v. Oklahoma case that they relied on used the state... was an issue where the state was using the public utilities to distort a different private market. That was, they required the utilities to buy Oklahoma coal instead of Wyoming coal. That was a private market. Same with the New England Power case. That was one where the utilities... the utility was required to hoard a natural resource, hydroelectric power. That was easily struck down. Now, protecting the local monopoly, the state-regulated monopoly market, is what drove the results in Tracy, and it would be a really odd result if the Dormant Commons Clause was then held to destroy that exact monopoly regime. Thank you, sir. Mr. Sawyer? You have five minutes, all of you. Mayor, please, the court. First, I would like to note that in the district court, the United States Statement of Interest is very clear in stating that SB 1938 discriminates in favor of companies with a local fiscal presence and in submitting that the motion to dismiss should be denied. Now, I understand on appeal, they only need to go as far as the remand, but there is that separate statement in the district court. Second, on the issue of facial as applied, I want to refer the court to our reply brief on page 4, footnote 1, where we point out that, citing the case of Dean Milk, that you still can, as the court did there, facially strike down a law, even though the law also applies to wholly in-state actors, in that case, the dairy farms that were in-state but outside five miles. So you can have a facial challenge here without having to resolve issues within ERCOT that facially strikes down this law with respect to the areas outside of ERCOT. And third, it is still unconstitutional because it facially discriminates as well as discriminates by effect and in purpose within those areas that are governed by the independent system operators. And within those areas, whether one calls that a facial challenge to those areas or as applied to those areas, it would be unconstitutional. The third point I wanted to make was with respect to Tracy. There's no dispute here that we're dealing with a single market of constructing, owning, and operating these interstate transmission lines. What they're saying is, well, the state should be allowed to protect a local electric utility in that market because it'll assist them in their captive market. But that is not what Tracy says. In fact, if that was it, Tracy wouldn't have to evaluate anything about the effects on two different markets. And here, that would suggest that if Texas wanted to, it could take other inputs into electricity. Let's say the transportation of coal or natural gas that's also used to generate electricity and say, we're gonna give a monopoly of that to the local utility because that will also help their economics. Nowhere is that found in Tracy or in other jurisprudence. And with respect to the Supreme Court's jurisprudence there, I'd like to return to Carbone, United Haulers, and Davis because Carbone was a case that specifically says we're dealing with the service here. And to the extent they talk about United Haulers and Entergy relies specifically on that and Davis, United Haulers wasn't the state regulating a market. It was the state as a market participant. And in Davis, the Supreme Court expressly said that if instead the government had created a monopoly in favor of a private hauler, we would have struck down the law just as we did in Carbone. And that's what we're doing, we're faced with here. Texas has created a monopoly in favor of Entergy, a private company. Well, they say, well, it's regulated like a public utility, but it is still privately owned. It is not the state of Texas becoming a market participant. And that is the essential distinction that applies there. And in fact, if one looks at the Carbone case, one sees that there was regulation of waste in that case. That's not simply a private enterprise, it has no regulation. And there was a municipal compact, which was entered into for the financing, building and operation of that facility. So we return to the position that this is controlled by Carbone. And I would also like to note with respect to the Texas AG's position on rates, that Texas AG stated before the Intermediate Appellate Court in Texas just last year, that allowing transmission-only entities to receive these certificates would not endanger the rate jurisdiction of PUCT. And I think the reason for that is spelled out there, by PUCT, I mean the Public Utility Commission of Texas. And the reason is that you have, for virtually all of these lines, some element of transmission that is interstate and where FERC is setting the rate, and that part has to be factored in, along with the parts that are set by the state. And that's why- What's the point of this? Is this just to say that there's a difference of opinion between the PUC commissioners and the AG? What's the point of that argument that you were just making? I'm sorry. Well, I think that what it goes to is that there is not a justification for this law that it's needed to preserve the rate jurisdiction of Texas in any way that's constitutionally significant here. I would also fully second, or support, the proposition that these justifications come into the second phase of the analysis. If it's discriminatory, then the state has that very heavy burden to show that the discrimination is justified and that there are no non-discriminatory ways to meet these objectives. And here there's an obvious way to meet that objective, which is the case-by-case determination by the Public Utility Commission of whether an applicant, including Nextera, is entitled to a certificate. Not an across-the-board statement that says, uh, you can't even get to the square one. You can't apply. There's no circumstances in which you can receive a certificate. Thank you very much, Your Honors. Thank you, Mr. Senator. That concludes our hearing in this case.